Aram H. MARDIROSIAN, Plaintiff,

v.

The AMERICAN INSTITUTE OF ARCHITECTS, and Seymour Auerbach, Defendants.

Civ. A. No. 77–1297.

United States District Court, District of Columbia.

June 25, 1979.

Edward Greensfelder, Jr., Gerald P. Greiman, Washington, D. C., for plaintiff.

Hogan & Hartson, James A. Hourihan, Ernest B. Abbott, Washington, D. C., for defendant American Institute of Architects.

## OPINION

**SIRICA, District Judge.**

This case presents an antitrust challenge to the ethical canons of a professional organization. Plaintiff Aram H. Mardirosian, an architect, filed the action in July 1977 after being suspended from membership in the American Institute of Architects (AIA). Mardirosian seeks treble damages against both the AIA, which found him guilty of violating two of its ethical standards, and Seymour Auerbach, the architect who filed charges of ethical misconduct with the AIA. Plaintiff also seeks injunctive relief against the AIA. An amended complaint was filed on May 18, 1978.[1]

Count I of the amended complaint alleges that Standard 9 of the AIA's Code of Ethics constitutes an unreasonable restraint of trade in violation of sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 & 3 (1976). It is stated solely against the AIA. Count II alleges that both defendants[2] violated the Sherman Act by enforcing AIA Ethical Standards 9 and 10 against the plaintiff, and by utilizing unreasonable and unfair disciplinary procedures to do so. Plaintiff seeks treble damages and injunctive relief under each of the first two counts. The final Sherman Act claim is stated in Count III, which alleges a continuing antitrust violation through the maintenance and enforcement of Standard 9 and requests a permanent injunction against its utilization. Counts IV and VI state common law tort claims against the AIA; Count V does the same for defendant Auerbach.

The action is presently before the Court on Mardirosian's motion for partial summary judgment confined to the issue of the AIA's *liability* on Count I.[3] The motion has been extensively briefed and has been argued to the Court. For the reasons that follow, the Court has concluded that there is no genuine dispute[4] over any fact material to a resolution of the question of the AIA's liability under Count I and that Mardirosian is entitled to a partial summary judgment as a matter of law.

### I.

### A. The National Visitor Center Project

The dispute between the two architects in this case arose in connection with the provision of architectural services for the alteration and refurbishing of historic Union Station in Washington, D.C., as the National

1. All parties have engaged in extensive discovery, much of it hotly disputed. Defendant Auerbach filed a counter-claim for defamation, interference with advantageous relations, and "conspiracy to deprive counterclaimant of his livelihood" on September 23, 1977.

2. Defendant Auerbach moved for partial summary judgment on Count II, the only antitrust claim against him, at an earlier stage of the action. On January 22, 1979, the Court issued a Memorandum and Order denying the motion without reaching the substantive Sherman Act questions presented in the first three counts of the amended complaint.

3. Rule 56 of the Federal Rules of Civil Procedure states, in part: "A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." Fed.R.Civ.P. 56(c).

4. The Court is mindful of the strict standards for summary judgment in this circuit stated in such cases as *Lee v. Flintkote Co.*, 193 U.S. App.D.C. 121, at 128, 593 F.2d 1275 at 1282 n.37 (1979) and *National Ass'n of Government Employees v. Campbell*, 192 U.S.App.D.C. 369 at 373, 593 F.2d 1023 at 1027 (1978). Indeed, plaintiff has offered the Court strong record evidence of certain anticompetitive purposes and effects of the challenged ethical standard which the Court will not consider because, when the underlying facts offered to establish those purposes and effects are "viewed in the light most favorable to the party opposing the motion," the Court cannot conclude that these purposes and effects have been so "conclusively demonstrated" as to "leave no room for controversy." *National Ass'n of Government Employees v. Campbell*, 192 U.S.App.D.C. at 373, 593 F.2d at 1027. Nonetheless, the Court finds that there are facts—not *genuinely* disputed—which establish conclusively plaintiff's right to relief under Count I when viewed in light of the antitrust principles stated by the Supreme Court in its recent decision in *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

Visitor Center.[5] Pursuant to the National Visitor Center Facilities Act of 1968, 40 U.S.C. §§ 801–831 (1976), the Secretary of the Interior was authorized to enter into agreements with the railroad owners of Union Station for the alteration of the building to provide facilities for a National Visitor Center and to construct a new railroad passenger station and parking facilities. 40 U.S.C. §§ 801 & 802 (1976). Congress appropriated funds for the project, and provided that the United States would lease the renovated Union Station facilities from the owners.

In 1968, the federal government, through the Secretary of the Interior, reached an agreement with the railroad owners pursuant to the legislation. The following year, the railroads contracted with defendant Auerbach for the provision of basic architectural services on the project. Under the contract, which was later amended, Auerbach was to prepare design and contract documents for the Visitor Center, the parking garage, and the new railroad station.

The authorizing legislation and the agreements between the railroad owners and the federal government contemplated that the government would monitor the work of the railroads' architects, engineers, and contractors to assure that it was in the government's interest and that costs were kept within proper limits. Accordingly, in September 1972, the government contracted with plaintiff Mardirosian for performance of certain consultative services with respect to the design and construction of the Visitor Center and parking garage. His responsibilities included oversight and coordination of the architect, the contractor, and the numerous private and government entities involved in the project.

In 1973, additional governmental involvement was authorized by statute. In that year, Congress amended the Act to authorize the Secretary of the Interior to "supplement" the alterations and construction being performed by the railroad owners by himself undertaking such activities. Pub.L. No. 93–62, 87 Stat. 146, 40 U.S.C. § 802(c) (1976). As a result, in 1974, the Secretary and the railroads executed an agreement whereby the government assumed direct responsibility for further construction on the Visitor Center (often referred to as project 1) and the railroads were relieved of any further responsibility therefor. By April 1975, the point at which the formal construction bids which had been solicited on Auerbach's design plans were opened, the government, through the Secretary of the Interior, was completely in control of the Visitor Center project, including Auerbach's contract for architectural services.[6]

That contract contained a detailed termination provision under which Auerbach could be discharged either for cause or for the convenience of the "owners." As amended in April 1974, the critical provision of Auerbach's contract stated: "The Owners may, by written notice to the Architect, terminate this contract in whole or in part at any time, either for the Owners' convenience or because of the failure of the Architect to fulfill his obligations under this

---

**5.** Most of the facts in this account are taken directly from those portions of plaintiff's statement of material facts which were not controverted by the AIA in its statement of material facts as to which there exists a genuine issue. *See* Local Rule 1–9(h). In some cases, where the AIA's response to one of plaintiff's statements of fact was only to dispute the *characterization*, but not the substance, of underlying facts, the Court has determined that no *genuine* dispute of material fact exists as to various facts stated. *See, e. g.,* Plaintiff's Statement of Material Facts, paras. 3, at 2, & 26, at 10–11 and AIA Statement of Material Facts, pt. II, paras. 3, at 5, & 26, at 11. In a few instances, the Court has relied directly on defendant AIA's version of certain facts stated in its papers or on documents in the record upon which both parties rely.

**6.** Plaintiff notes that Auerbach was under contract solely to the railroads. The AIA emphasizes that the railroads were merely nominal contracting parties by this time, the United States being the real party in interest under the contract. There is no dispute that the federal government was the party actually exercising the owner's prerogatives under the Auerbach contract by April 1975.

contract." Plaintiff's Motion for a Preliminary Injunction, exhibit A–12, at 5.[7]

The choice of termination method was to result in very different impacts on Auerbach. If the termination were for the owners' convenience, the contract provided a formula for computing full compensation for architectural services performed to the termination date. But if the termination were for cause, no compensation rights were provided, *id.*, thereby limiting the architect to periodic payments and reimbursements received prior to termination.

By April 1975, the same month in which the Visitor Center construction bids were opened, the responsible government officials had in fact decided to terminate the portion of Auerbach's contract relating to the Visitor Center; they requested Mardirosian to undertake such additional design and construction coordinating services as were necessary to complete the project by July 4, 1976. Although Auerbach learned unofficially of the termination decision in mid- or late April 1975, his contract was not formally terminated as to project 1 (the Visitor Center) until July 3, 1975.[8] At that point, Auerbach was terminated under the "convenience of the Owners" clause of his contract and fully paid for his work on project 1 in the amount of approximately $700,000; he remained under contract on the parking garage and the new railroad station projects. Mardirosian's contract with the government was amended on July 29, 1975, to include design and construction management work on project 1.

## B. The AIA's Disciplinary Actions

The American Institute of Architects, of which both Mardirosian and Auerbach were members, is the principal American professional organization of architects. Founded in 1857, it is organized as a membership corporation and comprises at least 27,500 licensed architects throughout the United States.[9]

To persons engaged in the business and profession of architecture, membership in the AIA is a valuable asset which enhances their ability to compete for and obtain architectural business. Members of the AIA normally use the insignia "AIA" following their names to denote membership. About half of the registered architects in the United States do, however, engage in the busi-

---

7. As noted above, in effect at least, the United States was exercising the owners' contract prerogatives at this point. When the government decided to effect Auerbach's termination formally, the responsible federal official simply instructed the railroad owners to do it. *See* note 8, *infra*.

8. Plaintiff's exhibit D, attached to his motion for partial summary judgment, provides a clear documentary record of the *formal* termination process. The second document in exhibit D is a copy of a letter, dated July 2, 1975, from the director of National Capital Parks, on behalf of the government, instructing the railroad owners (as the "nominal contracting party for the Government") to notify Auerbach immediately that his further services would not be required on project 1 and that his contract was being terminated "for the convenience of the Owners."

The letter alludes to the reasons for the termination in its second, third, and fourth paragraphs:

Further, and as you are aware, the receipt of bids and proposals from the subcontractor firms bidding on the reduced scope of plans and specifications for Project I, National Visitor Center, as prepared by Seymour Auer-

bach, developed costs far, far beyond the budget delineated for this project.

In compliance with the Department's directive to produce an operative, viable facility within the funding developed from budget guidelines, the Government has decided to defer essentially all permanent building construction with respect to Project I except for the basic restoration of the building and to develop alternative exhibits and visitor program facilities or any necessary temporary construction within close budget tolerances.

In light of the fact that the Government cannot construct the Architect's designs within budget limitations, we consider that any further architectural services with respect to Project I from Seymour Auerbach are not required.

On July 3, 1975, an official representing the owners wrote to Auerbach and gave him the requested notification. *See* Exhibit D (first document). The letter noted: "In the circumstances we have no alternative but to comply with [the request to terminate you for the convenience of the owners]."

9. There are estimated to be 60,000 registered architects in this country. Lawrence Affidavit, para. 4.

ness of architecture without the benefit of AIA membership.

The AIA carries on a wide variety of activities at the national level, including devising and publishing handbooks, forms, codes, and guidelines relating to the practice of architecture and the marketing of architectural services; promulgating and enforcing ethical standards; and publishing a monthly magazine and semi-monthly newsletter.

Each applicant for membership in the AIA receives a copy of the AIA's Standards of Ethical Practice, and must sign an application form which contains a declaration of compliance with the standards. The AIA enforces compliance by adjudicating charges of disciplinary violations brought by member architects or by state or local chapters of the AIA. Its adjudicative body is currently called the National Judicial Committee (formerly the National Judicial Board).

The AIA's 1977 Code of Ethics states that AIA members "shall not knowingly associate in practice with other architects who violate or intend to violate this Code." The corresponding paragraph of the 1978 Code provides that an architect "shall not knowingly practice with or be employed by others who act contrary to this code in the normal course of business." According to the affidavit of the AIA Secretary filed in support of the AIA opposition to plaintiff's motion, both these provisions were intended "to prohibit AIA members from joining with non-AIA members and firms in a deliberate effort to get around the requirements of the Code of Ethics." Lawrence Affidavit, para. 4. They do not, however, prohibit such association merely on the basis of *past* ethical violations. *Id.*

Since at least 1963, the AIA has maintained, in one form or another, an ethical standard which in May 1975 was known as Standard 9. The version of Standard 9 in effect in May 1975 provided:

An architect shall not attempt to obtain, offer to undertake or accept a commission for which the architect knows another legally qualified individual or firm has

been selected or employed, until the architect has evidence that the latter's agreement has been terminated and the architect gives the latter written notice that the architect is so doing.

Subsequently, Standard 9 was amended on two occasions. On June 20, 1975, the notice requirement was changed to "written or other equivalent notice." On July 1, 1977, the language "or other equivalent" was deleted. The current version of Standard 9, which appears as Rule 605 of the AIA's Code of Ethics and Professional Conduct, adopted July 1, 1977, is virtually identical to the May 1975 version of Standard 9 set out above.

Over the past 15 years, the AIA has enforced compliance with Standard 9 through its disciplinary proceedings and the imposition of sanctions. From 1963 through 1977, the AIA processed 79 cases of alleged violations of Standard 9. Sanctions were imposed in 28 of these cases.

Mardirosian's replacement of Auerbach on the National Visitor Center project led to charges that he had violated Standard 9 and eventually resulted in another case in which the AIA imposed sanctions.

As noted in part I–A, *supra*, the government had decided to dispense with Auerbach's services by April 1975. On May 2, 1975, prior to the formal termination of his contract, Auerbach filed charges of ethical misconduct against Mardirosian with the AIA. The charges stated, in part:

I have learned that Mr. Aram Mardirosian, A.I.A., practicing architecture as a principal in the firm known as "The Potomac Group" *has undertaken or is in the process of negotiating for certain architectural and engineering responsibilities for The National Visitor Center for which we have a contract in force.*

Mr. Mardirosian has been acting in an advisory capacity on this project under contract with The National Park Service and in such capacity has full knowledge of the status of our contract.

On the basis of this first allegation I charge Mr. Mardirosian . . . to be

in violation of Paragraph 9 of the Standards of Ethical Practice of the Institute. Plaintiff's Motion for a Preliminary Injunction, exhibit A–15 (emphasis added). Auerbach also charged Mardirosian with a violation of AIA Ethical Standard 10 because Mardirosian had allegedly failed to give proper attribution to Auerbach in drawings prepared by the Mardirosian firm which allegedly incorporated Auerbach's designs.

Eventually, following lengthy disciplinary proceedings, the AIA's National Judicial Board issued a report on Auerbach's charges. The Board's seven findings of fact can be summarized as follows:

1. Auerbach was under Contract to design modifications of Union Station to be used as a National Visitor Center; the United States was the real party in interest under this contract; and the National Park Service was responsible for the final decision concerning Auerbach's work;

2. Mardirosian, a former Park Service employee, contracted with the Service to coordinate Auerbach's and other's work;

3. Beginning in July 1973, Mardirosian issued various highly critical reports on Auerbach's work, including a recommendation, in August 1973, that he be replaced;

4. Auerbach's contract documents for the Visitor Center were completed in late February 1975. The bids received on these drawings were substantially higher than the available budget and the Visitor's Center was held in abeyance until about March 1975. Meanwhile, Auerbach modified his plans to bring them within the available budget and Mardirosian was so informed;

5. "In April, 1975, or earlier, after being instructed by National Park Service representatives 'not to contact Mr. Auerbach,' Mr. Mardirosian entered into negotiations with the National Park Service to provide architectural and engineering responsibilities for the National Visitor Center, and his

firm commenced work on that project. At that time Mr. Auerbach's contract for the same work was still in effect and Mr. Mardirosian, having full knowledge of that fact, did not give Mr. Auerbach written or other equivalent notice that Mr. Mardirosian's firm was negotiating with the National Park Service to take over Project (1), and he did not advise Mr. Auerbach that his firm had commenced work on Project (1);"

6. Auerbach's services on the Visitor Center were terminated on July 3, 1975. Mardirosian's firm entered into an amendment to its earlier contract on July 29, 1975, under which it was to provide full professional services on the Visitor Center;

7. Some of Mardirosian's plans contained design elements from Auerbach's work without attribution. *See* Report of the National Judicial Board, Plaintiff's Motion for a Preliminary Injunction, Exhibit A–21.

On the basis of these findings, the Board concluded, without explanation, that Mardirosian was guilty of violating AIA Ethical Standards 9 and 10 and recommended that his membership in the AIA be terminated.

Mardirosian appealed the decision to the AIA's Executive Committee. On July 21, 1977, the Committee adopted the Board's report, but modified the sanctions against Mardirosian to a one-year suspension of his AIA membership for the violation of Standard 9 and censure for the violation of Standard 10.[10] This action immediately followed thereafter.

Under the AIA's rules pertaining to suspensions, Mardirosian was prohibited from using the initials "AIA" after his name, from holding himself out to the public as a member of the AIA, and from attending meetings or participating in any way in AIA activities, but was required to continue to pay dues.[11] Pursuant to AIA bylaws, a

---

10. The "conclusions" section of the report was also modified to delete statements that the violation of Standard 9 was "deliberately planned and done with the cooperation of former associates employed by the federal agency acting in position of Owner" and that it resulted in adverse effects to the public. With regard to the violation of Standard 10, the conclusion was modified to delete a reference to "maliciously" attempting to injure Auerbach.

11. Mardirosian's suspension was set to expire on November 1, 1978.

summary of the disciplinary action was published in the organization's semi-monthly newsletter.

█ Although the AIA states that its disciplinary action caused plaintiff no injury to his business or property, AIA's Statement of Material Facts, pt. II, para. 27(a), it does not controvert plaintiff's contention that "[c]ensure, or suspension of membership by the AIA injures an architect's reputation, standing and ability to obtain projects and other employment." *Compare id.* para. 18 *with* Plaintiff's Statement of Material Facts, para. 18.[12]

Finally, it is conceded by the AIA that Standard 9 affects interstate commerce as well as commerce in the District of Columbia.

## II.

### A. Elements of Section 1 Violation

█ Under section 1 of the Sherman Act, concerted activity "in restraint of trade or

commerce among the several States" is declared to be unlawful.[13] 15 U.S.C. § 1 (1976). Although, by its literal terms, section 1 embraces all concerted activity which restrains trade, the courts have uniformly focused their inquiry on whether there has been an *unreasonable* restraint of trade.[14] *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 687–90, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

█ The Clayton Act, in turn, provides a cause of action for treble damages to persons injured in their business or property by reason of a violation of the antitrust laws.[15] To prevail on the liability phase of Count I of his amended complaint, therefore, plaintiff must establish, on facts about which there is no genuine dispute: (1) concerted activity (contract, combination, or conspiracy); (2) constituting an unreasonable restraint of trade; (3) in commerce; (4) causing injury to plaintiff's business or property.[16]

12. Under section 4 of the Clayton Act, an action for damages may be brought by a person "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15 (1976). The undisputed fact of plaintiff's suspension from membership in the AIA, coupled with the undisputable fact that membership in the organization is a valuable professional asset (*see* Plaintiff's and AIA's statements of Material Facts, paras. 17) and the AIA's concession, noted above, leave no doubt as to the *existence* of injury, within the meaning of section 4, to Mardirosian's "business or property." Whether all, or any part, of the reduction in plaintiff's billings was occasioned by the AIA's allegedly unlawful conduct is a separate, disputed, issue going to the *amount* of damages. *See id.,* paras. 27. That issue has not been presented in the ĩnstant motion, and the Court will express no view on it here, except to say that the *amount* of damages caused by the AIA's unlawful conduct is a subject of genuine dispute.

13. Section 3 of the act makes the same declaration with respect to restraints of trade "in any Territory of the United States or of the District of Columbia, . . . or between any such Territory or Territories and any State or States or the District of Columbia . . . , or between the District of Columbia and any State or States . . . ."

There is no question that the restraint of trade alleged in Count I of the amended com-

plaint is in and affects commerce within the meaning of sections 1 and 3. *See* Statements of Material Facts, paras. 31. *See generally Goldfarb v. Virginia State Bar,* 421 U.S. 773, 783–85, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

14. Or, more precisely, "whether the challenged contracts or acts 'were unreasonably restrictive of competitive conditions.'" *National Society of Professional Engineers v. United States,* 435 U.S. at 690, 98 S.Ct. at 1364 (quoting *Standard Oil Co. v. United States,* 221 U.S. 1, 58, 31 S.Ct. 502, 55 L.Ed. 619 (1910)).

15. Section 4 of the Clayton Act states:
[That] any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
15 U.S.C. § 15 (1976); *see* note 12, *supra.*

16. It is clear that the requisite element of concerted activity under section 1 can be found in joint associational activities and, in particular, agreement by members of an association to abide by the association's canons of ethics. *See* Memorandum filed Jan. 22, 1979, at 6. The

## B. Professional Societies and the Rule of Reason

The focus of section 1 is on unreasonable restraints of trade. The primary mode of Sherman Act analysis has therefore become known, appropriately, as the "rule of reason." A complementary category of analysis, a *per se* category, contains "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *National Society of Professional Engineers v. United States*, 435 U.S. at 692, 98 S.Ct. at 1365.[17]

■ There is no longer any question that the activities of learned professional societies are subject to the prohibitions of the Sherman Act, and hence to the rule of reason. Although "professional services may differ significantly from other business services, and, accordingly, the nature of the competition may vary," this difference does not create "a broad exemption under the Rule of Reason for learned professions." *National Society of Professional Engineers v. United States*, 435 U.S. at 696, 98 S.Ct. at 1367.

Most important, the touchstone of the Sherman Act in *all* cases is competition. As the Supreme Court recently observed in *Professional Engineers*, another case involving a challenge to a professional association's canons of ethics: "[In both the *per se* category and under the rule of reason] the purpose of the analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry. Subject to exceptions defined by statute, that policy decision has been made by the Congress." *Id.* at 692, 98 S.Ct. at 1365.

In *Professional Engineers*, the United States challenged a provision of a professional organization's canons of ethics which prohibited its members from engaging in competitive bidding. The society proffered one basic justification for the ban: that it protected the public safety by "minimizing the risk that competition [competitive bidding] would produce inferior engineering work." The Court defined the question before it as whether the district court had been correct in refusing to make any factual findings as to whether these "dire consequences" would actually result and rejecting the defense out of hand. *Id.* at 681, 98 S.Ct. at 1360.

In evaluating the legality of the ban, the Court said, the *only* issue was its competitive impact. On the negative side, "no elaborate industry analysis [was] required to demonstrate the anticompetitive character of such an agreement." 435 U.S. at 692, 98 S.Ct. at 1365. "On its face," the Court concluded, "this agreement restrains trade within the meaning of § 1 of the Sherman Act." *Id.* at 693, 98 S.Ct. at 1366. On the positive side, moreover, the society's affirmative defense that the competitive bidding ban prevented inferior work and insured ethical behavior among engineers was simply not relevant to analysis under the rule of reason. In fact, the Court said, the attempt to justify the restraint on that basis was "nothing less than a frontal assault on the basic policy of the Sherman Act." If competition is not to be the norm for a particular industry, or profession, that decision is for Congress, and not the courts, to make.

Although acknowledging that professional canons of ethics "may serve to regulate and promote" competition and that "the problem of professional deception is a proper subject of an ethical canon," the Court concluded:

AIA does not dispute the presence of that element in this case.

As noted above, the commerce requirement is likewise not disputed and the Court finds that the fact of injury to business or property is not the subject of genuine dispute. *See* notes 12 & 13, *supra*.

17. As such, it could be said that the *per se* rule is a subset of the rule of reason, *i. e.*, that some arrangements are so clearly unreasonable that they are "presumed illegal without further examination under the rule of reason." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed. 2d 1 (1979).

the equation of competition with deception . . . is simply too broad; we may assume that competition is not entirely conducive to ethical behavior, but that is not a reason, cognizable under the Sherman Act, for doing away with competition.

In sum, the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable.

*Id.* at 696, 98 S.Ct. at 1368.[18]

### III.

Mardirosian argues that Standard 9 unreasonably restricts competition in the market for architectural services. He offers three separate routes for reaching his conclusion that the Standard is unlawful both on its face and as it was applied to him. First, Standard 9 and its enforcement by the AIA are said to constitute a group boycott which is unlawful *per se.*[19] Second, the restraint of trade effected by use of the Standard is said to be indistinguishable, in substance, from the restraint effected by the ban on competitive bidding struck down in *Professional Engineers.* Third, because undisputed purposes and effects of the Standard are said to be plainly anticompetitive and not offset by any valid procompetitive justifications, it is argued that the restraint is unlawful under the rule of reason.

**18.** Justices Blackmun and Rehnquist did not join the "rule of reason" segment of the five-member majority opinion, saying they did not wish to go as far as the majority in "intimating . . . that any ethical rule with an overall anticompetitive effect promulgated by a professional society is forbidden under the Sherman Act." 435 U.S. at 699, 98 S.Ct. at 1369. According to Justice Blackmun's concurrence, the Court's opinion holds "that ethical norms can pass muster under the Rule of Reason only if they promote competition." *Id.* at 701, 98 S.Ct. at 1370.

Several months after the *Professional Engineers* decision, the District of Columbia Circuit, citing the Blackmun concurrence, stated that the *Professional Engineers* majority had "suggested that ethical norms designed to regulate competition . . . can be justified only if they 'have *no* anticompetitive effect'." *Smith v. Pro Football, Inc.,* 193 U.S.App.D.C. 19 at 35, 593 F.2d 1173 at 1189 n.68 (1978).

In *Smith,* the actual analysis employed by the D.C. Circuit under the rule of reason was to inquire whether the challenged restraint was shown "to have positive, economically *procompetitive* benefits that offset its anticompetitive effects, or, at the least, if it is demonstrated to accomplish legitimate business purposes and to have a net anticompetitive effect that is insubstantial." *Id.* at 193 U.S.App.D.C. at 34–35, 593 F.2d at 1188–89.

**19.** It is true that group boycotts have often been deemed to fall into the *per se* category. *E. g., Fashion Originators Guild v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). But whether the actions of the AIA in promulgating and enforcing Standard 9 are properly characterized as a group boycott is highly problematic. As developed below, *see* pt. IV–A, *infra,* the AIA's actions have the threshold characteristic of a classic boycott: an attempt by "competitors to barricade 'themselves from competition at their own level'." *Smith v. Pro Football, Inc.,* 193 U.S.App.D.C. at 24, 593 F.2d at 1178 (1978).

On the other hand, it is not clear that the attempt, here accomplished, in part, by a form of refusal to deal (suspension or termination of membership), is made in circumstances where the potential for effectuation of a true explicit boycott (in the sense of causing a near total inability to compete) is serious enough to warrant a *per se* approach. *See* L. Sullivan, Antitrust § 86 (1977) (purpose and effect as guides to characterization as *per se* boycott); *cf. Smith v. Pro Football, Inc.,* 193 U.S.App.D.C. at 24 n.16, 593 F.2d at 1178 (refusal to deal with competitors type boycott effective only where such dealing necessary in order to carry on their business).

Membership in the AIA is not an essential prerequisite to the practice of architecture. *See* Lawrence Affidavit, para. 4. Nor is there anything in plaintiff's motion to indicate that the AIA directly attempts to induce procurers of architectural services not to deal with censured, suspended, or terminated members.

Moreover, the Supreme Court recently warned of applying "easy labels" to commercial conduct in order to bring that conduct under a *per se* regime. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). And this followed *Continental T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49–50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), where the Court strongly emphasized the demanding standards for invocation of *per se* rules under section 1 in overruling the landmark *Schwinn* doctrine. *See also Smith v. Pro Football, Inc.,* 193 U.S.App.D.C. at 27, 593 F.2d at 1181.

For these reasons, the Court declines plaintiff's invitation to characterize the AIA's enforcement of Standard 9 as a "classic or explicit" group boycott which is *per se* unlawful.

The Court cannot agree that the restraint imposed through Standard 9 necessarily falls into the *per se* category. *See* note 19, *supra.* Nor is the Court convinced that there are no genuinely disputed facts material to a finding that Standard 9 effectively prohibits competitive bidding in a manner indistinguishable from the restraint challenged in *Professional Engineers.*[20]

The Court does agree with plaintiff, however, that there are no genuinely disputed facts which prevent its resolution of the question of the standard's lawfulness under the rule of reason. Having evaluated Standard 9 under the rule of reason, the Court concludes that it is unlawful, as alleged in Count I of the amended complaint. The Court has reached this conclusion in light of both the restraint imposed by the Standard on its face, and the Standard's actual application in the Mardirosian disciplinary case.

*A. The Restraint Imposed by the Standard on its Face: Operation at the Selection Stage*

Standard 9 states that an architect cannot "attempt to obtain, offer to undertake, or accept a commission for which he knows [another architect] has been selected or employed, until the architect has evidence that the latter's agreement has been terminated and the architect gives the latter written notice that the architect is doing so." By the Standard's express terms then, once an architect has been "selected" for a commission, another architect may not "attempt to obtain" the same commission unless: (1) the second architect "has evidence" that the first "agreement has been terminated" and (2) the second architect gives the first "written notice" of his attempt (or offer or

acceptance, as the case might be). Or, as the AIA characterizes the "two requirements" of the Standard: "First, an AIA member architect cannot ethically seek a commission . . . if he knows both that another architect has already obtained the same commission, and that the other's agreement with the owner is in effect. Second, a member architect cannot ethically accept a commission, if he knows that another architect has previously agreed with the client on that commission, without notifying the architect already engaged." AIA Opposition to Plaintiff's Motion for Partial Summary Judgment, at 5.

Apart from the terms of the Standard itself, plaintiff relies on extensive extrinsic evidence, in the record, to resolve the major ambiguity in Standard 9: the use of the phrase "selected or employed" to denote the status of one architect which triggers the Standard's conceded restraints on the conduct of another architect.

An examination of the record materials relied on by plaintiff, and of the defendant's response, viewed in the light most favorable to the AIA, convinces the Court that plaintiff has conclusively demonstrated that the term "selected" in Standard 9 is used to bring its restraints into play at a point in the hiring process when an architect has merely been identified as the first with whom an owner will attempt to negotiate a binding, enforceable contract.

This is not to say that the AIA has conceded this point or that no facts could be imagined which would cast sufficient doubt on the proposition to cause it to be genuinely disputed. But when a motion is "made and supported" as provided in Rule 56, it is

---

**20.** Plaintiff has demonstrated that the AIA *discourages* initial selection of an architect based on price factors. *See* text accompanying notes 23–24, *infra.* He has also shown that there is no genuine factual dispute that Standard 9's prohibitions apply at the point of initial selection, *i. e.,* when an owner has identified an architect with whom he will attempt to negotiate a final contract for services. *See* pt. III-A, *infra.* Nonetheless, considering plaintiff's heavy burden of demonstrating the absence of factual dispute on a motion for summary judgment, *see* note 4, *supra,* the Court cannot conclude that plaintiff has established that Standard 9 actually prohibits competitive bidding, particularly with regard to the actual *effect* of the standard in the market for architectural services. *See* Affidavit of Robert M. Lawrence, at 4–5; AIA Opposition to Plaintiff's Motion for Partial Summary Judgment, exhibit 8 (correspondence relating to ethical violation charge between AIA and counsel); Deposition of Aram Mardirosian, at 79–80. It is not the Court's function to try facts on a Rule 56 motion, but only to determine whether a genuine factual dispute exists. *See* note 4, *supra.*

not required that facts be *conceded* to grant a motion for summary judgment. Nor does Rule 56, unlike Rule 12(b)(6), mandate the consideration of purely imaginary facts in support of a party's position. On the contrary, Rule 56(e) states: "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Fed.R.Civ.P. 56(e). As against the conclusive evidence supporting plaintiff's motion on this point, the AIA has responded with precious little, even in the form of allegations or denials,[21] and, as will be developed below, has offered *no* record evidence that the phrase "for which [another architect] has been selected *or* employed" in Standard 9 (emphasis added) really means "for which another architect has concluded a contract."

Plaintiff offers overwhelming record evidence in support of his largely uncontroverted, although not conceded, argument that Standard 9 is intended to, and does in fact, apply to conduct at the initial identification, pre-contract stage. An affidavit of the AIA's executive vice-president and chief executive officer, executed in connection with antitrust litigation against the American Society of Civil Engineers in 1976, states:

> The Institute interprets Paragraph 9 of its Ethical Standards as requiring its members to recognize that another member has a legally and morally protectable interest when he has in fact entered into an agreement for an architectural commission, *and even when he has been "selected," i. e., identified responsibly and is engaged in definitive completion of the actual agreement* or employment process.

Affidavit of William L. Slayton, para. 13, Plaintiff's Motion for a Preliminary Injunction, exhibit D (attachment) (emphasis added).

Mr. Slayton's statement unambiguously establishes his understanding that the term "selected," in Standard 9, refers to the post-identification, pre-contract stage of an architect's negotiations with a prospective client. The AIA does not comment upon Slayton's interpretation of Standard 9 and the meaning of selection. It does, however, attempt to undercut its force by observing that his views are not authoritative.[22]

---

**21.** Although vigorously disputing plaintiff's assertion that the term "selection" in Standard 9 "refers to the point at which an owner has singled out an architect, based on professional competence and other non-price facts, with whom he will enter into negotiations in an attempt to conclude a mutually satisfactory contract for work on the project," the AIA devotes its factual rebuttal almost exclusively to the proposition that it does not "prohibit bidding." *See* AIA Opposition to Plaintiff's Motion for Partial Summary Judgment, at 17–20. Nowhere does the AIA offer any explanation of its use of the phrase "selected or employed" in Standard 9. In fact, the Court has been able to locate only one attempt in the AIA's papers to define the term "selected" affirmatively, and that definition merely states, ambiguously, that selection "refers to the point when the owner and architect have *reached an agreement* that the architect is to perform complete, basic architectural services for the owner." *See* AIA Statement of Material Facts, pt. II, para. 29(c).

The AIA avoids taking a clear position on the question whether selection occurs prior to the negotiation of an actual contract by using ambiguous terminology, *see* AIA Opposition to Plaintiff's Motion for Summary Judgment, at 5, or in other cases, by noting in what situations it is willing to conclude the Standard *does* apply, *see, e. g.,* AIA Statement of Material Facts, pt. II, para. 30(c). In fact, the only time the AIA states, unambiguously, that Standard 9 applies *only* where a contract is in force, is in its response to plaintiff's reply to its opposition (at 4). The citation following this statement is to a paragraph of the AIA Statement of Material Facts (pt. I, para. 1(d)) which offers no support for that proposition.

**22.** The AIA's response to this affidavit is typical of its posture on the selection issue. After explaining that, under its bylaws, Mr. Slayton's opinion is not "authoritative," the AIA observes that the affidavit:

> states merely that an architect is "selected" if he is "identified responsibly and is engaged in definitive completion of the actual agreement or employment process." The affidavit nowhere suggests that one can be "identified

Plaintiff does not point to an "official" definition of selection by the AIA—apparently there is none. But if there is any doubt that the sworn explanation of the Standard's applicability by the AIA's chief executive officer is correct, it is dispelled by (1) a series of AIA publications describing the architect selection process; (2) a disciplinary action by the AIA's National Judicial Board finding Standard 9 to be applicable at the pre-contract stage; and (3) an observation about an architect's ethical obligations at that stage in the AIA's *Architect's Handbook.*

The AIA publications explain precisely how the pre-contract negotiation process should and does work in practice. They show that "selection," or more precisely, "comparative selection," is a term of art in the profession, referring to a process by which a prospective client ranks architecture firms after preliminary submissions and interviews, followed by identification of one firm or architect with whom the client will attempt to negotiate a mutually satisfactory contract. These publications,[23] which purport to advise owners and architects on such subjects as selecting, negotiating with, and compensating architects, all explain that there are three ways to select an architect—direct selection, design competition, and comparative selection—and outline the comparative selection process in detail.

"Your Architect's Compensation," a 1978 AIA publication, is representative. It lists five steps in the comparative selection process:

(1) "*You invite* a number of firms to tell you about their qualifications."

(2) "*You evaluate* the submissions to see which firms appear to be best able to handle the proposed project."

(3) "*You interview* representatives of at least three of the most highly qualified firms to see how they would go about providing the required services."

(4) "*You rank* the top firms in order of competence, understanding of the project, and ability to meet your programming and schedule demands."

(5) "*You negotiate* with the first-ranked firm to determine, in detail, the services required and the resulting compensation. . . . If you fail to agree on a fair scope of design services and compensation with the first-ranked firm, you move on to the second-ranked firm and, if necessary, to the third." Plaintiff's Motion for Partial Summary Judgment, exhibit K, at 3 (emphasis in original).

Following this list, the booklet states, in larger boldface type separated from the main text by horizontal cut-off lines: "Only after a thorough understanding is established between you and the architect you have picked can a true scope of services and the resulting compensation be fairly established. . . . *It is in your best interest to choose one firm for initial discussion* on services and the compensation related to those services." *Id.* (emphasis added).

These AIA publications offer a clear view, uncontradicted by the AIA in this action, of the actual selection and contract negotiation process in the market for architectural services.[24] They show that selec-

---

responsibly" and engaged in "definitive completion" of an "actual" contract without having discussed the price of architectural services.

AIA Opposition to Plaintiff's Motion for Partial Summary Judgment, at 17. This observation in no way contradicts the key underlying fact that selection, under Standard 9, occurs when an architect is identified and is negotiating a final agreement. As this example illustrates, the genuine dispute between the parties is over the interaction of Standard 9 with price competition, and not over the meaning of "selected."

**23.** The publications include: "Your Architect's Compensation" (AIA 1978); *Architect's Handbook of Professional Practice,* "The Architect and Client" (AIA 1975); "You and Your Architect" (AIA 1973); and "How to Find, Evaluate, Select, Negotiate with an Architect" (AIA 1973). Plaintiff's Motion for Partial Summary Judgment, exhibits J to M.

**24.** The AIA publications also emphasize that many large clients, and most clients who do not use the direct selection method, use comparative selection. *See, e. g.,* Plaintiff's Motion for Partial Summary Judgment, exhibit K, at 3.

tion, in the comparative selection process, refers to the identification of one architect or firm with whom an owner will negotiate, and that discussions with additional architects or firms are to take place only after a breakdown in negotiations with the first architect or firm.

The AIA's *Architect Handbook of Professional Practice,* published in 1975, explains explicitly how an architect's ethical obligations relate to this process. Following a description of the selection and negotiation procedure quite similar to that described above, the *Handbook* states: "It is important for the Architect to be aware of the Standards of Ethical Practice, AIA Document J330, concerning solicitation of a client when another architect has been retained for a project. An attempt to supplant another architect *who is in the process of negotiating for a commission* should be viewed as detrimental to the selection process." *Handbook,* at 5, Plaintiff's Motion for Partial Summary Judgment, exhibit M (emphasis added).

Finally, the AIA has provided plaintiff and the Court with a complete history of its disciplinary proceedings relating to Standard 9. Each set of charges filed with the AIA and a copy of the AIA's final disposition of the charges is included.

Case Number 28, decided by the AIA's National Judicial Board on June 3, 1975, just one month after Auerbach filed his disciplinary charges against Mardirosian, applies Standard 9 to censure a member architect for violation of the Standard's written notification requirement where the architect not notified clearly had no contract. In fact, the Board described the first elected or employed firm as having an "initial understanding" that a client school board would "seek their services upon approval of funds by the (County) Board of Supervisors." Case No. 28, Report of the National Judicial Board, at 2, Plaintiff's Motion for Partial Summary Judgment, exhibit F. In its final "Conclusion," the Board referred to the disciplined architect's knowledge of the "earlier contingent commitment of the School Board to [the complaining architects]." *Id.* at 3.[25]

In contrast to the conclusive record evidence offered in support of plaintiff's contention that there are no genuinely disputed facts regarding this aspect of Standard 9, the AIA offers little even by way of explanation of its position on the meaning of the term "selected." *See* note 21, *supra.*

In its statement of material facts, the AIA does cite two of its disciplinary cases and two letters its officers had written in response to ethical inquiries for the proposition that the Standard does not prohibit competitive bidding but "does require that

---

**25.** In two other cases, in which charges were eventually withdrawn, letters of complaint to the AIA by its members indicate that "selected" in Standard 9 is perceived by members as applying at the point of initial, pre-contract identification of an architect.

In Case No. 32, an architect's firm had presented its qualifications and brochure to municipal commissioners for a prospective project. Its letter of complaint indicates that in its presentation, it had "insisted that any question of fees or extent of services be negotiated after selection of the qualified firm." Later, the commissioners informed the firm of its "selection as Architects for the project." The following month the charging firm met with the commissioners to "present the proposed contract" and "discuss details of the services and compensation involved." Moreover, "[N]o formal agreement was finally negotiated at that meeting. . . ." When the charging firm later learned that another architect was going to make a presentation to the commissioners regarding the same project, it called him to make sure he understood it had "already been selected." The second architect told the firm, since there was no contract, the issue was still open. The commissioners then solicited new proposals including, as the charging firm put it, "a proposed Contract—presumably making it necessary for us to out-guess the other applicants as to the services and fees required."

Eventually, although the second architect proposed a lower fee than the charging architects had been negotiating, the complaining firm was awarded the project once again. On the basis of these facts, the first firm charged the second architect with a violation of Standard 9 "in that he continued to attempt to secure a commission from [sic] which our firm had previously been selected." Case No. 32, at 1, Plaintiff's Motion for Partial Summary Judgment, exhibit F. Clearly, the complaining firm understood "selection" to refer to the pre-contract, pre-negotiation stage of this comparative selection process. *See also id.,* Case No. 33.

an architect not accept a commission for basic services which is subject to the existing and conflicting contractual rights of another." Para. 28. If the implication of this statement is intended to be that these are the *only* circumstances in which the Standard applies, that implication is not supported by the AIA's citations. Even considering the cited materials in the light most favorable to defendant, they have nothing to do with the most fundamental of plaintiff's contentions: that "selected" refers to a point in time prior to conclusion of a contract.

The AIA's first citation is to a written response of Hillard T. Smith, the AIA Secretary, to an inquiry regarding the applicability of Standard 9. The defendant's brief simply notes, without explanation, that Mr. Smith stated: "The obvious problem, of course, is whether or not the first architect . . . has a *continuing, binding contract* for the design of the center." AIA Opposition to Plaintiff's Motion for Partial Summary Judgment, at 18 (emphasis added in AIA brief). What the AIA brief does not explain, however, is that the inquiry Mr. Smith was responding to was a request for advice as to the "legal problems" which would result where a local organization wanted to hold a design competition for a municipal project which the city had, years earlier, contracted with an architect to design:

> A local organization was formed to obtain a civic auditorium and possibly a civic center for this area.
>
> Several years ago an attempt was made by the city to build a civic center. An architect was selected and preliminary studies were prepared. Then the bond issue to finance the project failed to pass. The architect has a contract with the city for architectural services on a civic center. Without seeing the contract, can you envision the legal ramifications of an architectural competition in this instance?

*Id.,* exhibit 1. The letter of inquiry then asks: "If the local organization turns to the city to vote for financing after selecting the architect in a design competition, an architect other than the one with the contract, what would be the legal problems?" In these circumstances, it is hardly surprising that the response opened by identifying the "obvious problem" whether the first architect had a currently binding contract. That would be hornbook law and the obvious response to a request for legal advice, even in the absence of Standard 9. The quoted language—which is sadly out of context—obviously and unambiguously relates to the legal problems of the city, not the ethical responsibilities of an architect. It is clearly not, as the brief seems to imply, an official interpretation of the meaning of selection in Standard 9.

The AIA's use of Case No. 18 is equally disingenuous. Counsel simply notes that "the Board stressed that for a violation of Standard 9 to occur, '[t]he commission involved must be an existing *commission* between the client and the first architect . . . .'" *Id.* at 19. (emphasis added). What is not explained is that the client-owner in that case was a mortgagee who had taken possession of the project. The Board simply found that there was "no commission between the mortgagee-client and the first architect" and that the original contract between the mortgagor and the first architect did not bind the mortgagee. Plaintiff's Motion for Partial Summary Judgment, exhibit F, Case No. 18, at 1–2.

In other words, there was no selection, employment, contract or *any* other relationship between the new owner and the first architect. Again, the reference to the requirement of an "*existing* commission," as opposed to a *former* commission, is hardly noteworthy and, in any event, says nothing about the meaning of "selected." Case 38, the other record document cited by the AIA, is equally unhelpful on the selection issue.

Because of the conclusive nature of the plaintiff's showing on this factual issue,[26]

---

**26.** *National Ass'n of Government Employees v. Campbell,* 192 U.S.App.D.C. at 373, 593 F.2d at 1027 (1978).

and the failure of the defendant to allege and support specific facts to the contrary,[27] the Court finds that the record establishes—with such clarity as to leave no room for controversy—that there is no *genuine* dispute of fact that: (1) the term "selected" in AIA Standard 9 refers to that point in the pre-contract stage of the hiring process when an architect has been identified as the first one with whom an order will attempt to negotiate a binding contract; and (2) that the prohibitions on member conduct in the Standard apply at that point.

*B. Application of Standard 9 to Mardirosian: Operation at the Post-Contract Stage.*

Apart from preventing attempts to obtain, or acceptance of, a commission by an architect during the period in which another architect, having been initially selected or responsibly identified, is negotiating for the same commission, Standard 9 likewise prevents attempts to obtain, or acceptance of, a commission after another architect is actually under contract for that commission. By the unambiguous terms of the Standard, only when the competing architect has evidence that the first architect's contract has been terminated, can he "attempt to obtain, offer to undertake, or accept" the commission, and then, only after he has given the first architect written notice that he is doing so. *See* AIA Statement of Material Facts, para. 28(c); AIA Opposition to Plaintiff's Motion for Summary Judgment, at 5. On the face of the Standard, it applies to *any* attempt or undertaking of *any* commission for which another "legally qualified" architect has been "selected or employed," regardless of the circumstances of the attempt or of the selection or employment.

In the instant case, Mardirosian was charged with and was found to have violated Standard 9 in circumstances where, although the first architect had an existing contract, that contract was terminable at the "convenience of the Owners." The formal charge—levelled by the first architect—was simply that Mardirosian had "undertaken or [was] in the process of negotiating for" architectural services covered by an existing contract. The AIA's National Judicial Board found that Mardirosian had "entered into negotiations[28] with the National Park Service" and begun work while Auerbach's contract was still in effect, and that he had not given Auerbach notice either of the negotiations or of the commencement of work on the project. Relying on these findings, the Board, and later the AIA executive committee, concluded that Mardirosian had violated Standard 9 and suspended him from membership for a period of one year. *See* AIA Statement of Material Facts, pt. I, para. 2(c); AIA Answers to Plaintiff's Second Set of Interrogatories, No. 31.

As the AIA views plaintiff's claim, only its actions in the Mardirosian disciplinary case are relevant to the Sherman Act issues presented in Count I. According to the AIA, plaintiff has no standing to raise any illegality connected with the selection provision, regardless of its meaning, because the Board did not rely on that provision in its Mardirosian decision and since the first architect clearly had an actual contract.

The causation or standing requirement in private treble damage actions stems from the language of section 4 of the Clayton Act that such actions may be brought by a person "injured in his business or property *by reason of* anything forbidden in the antitrust laws." 15 U.S.C. § 15 (1976).

■ The issue raised by the AIA is whether, in evaluating the competitive sig-

---

27. Fed.R.Civ.P. 56(e); *see Lee v. Flintkote Co.,* 193 U.S.App.D.C. at 127, 593 F.2d at 1281 (1979).

28. The AIA now contends, however, only that plaintiff "indirectly solicited the Government's decision to request plaintiff to perform work subject to defendant Auerbach's contract through his unfair criticisms" of Auerbach's work, his recommendation that Auerbach's services be terminated, and "his reliance on his status as former associate of National Park Service personnel." AIA Statement of Material Facts, pt. II, para. 11. Plaintiff contends that he neither "solicited" nor "initiated" the government's decision. Plaintiff's Statement of Material Facts, para. 11.

nificance of the restraint imposed by Standard 9, the Court should consider that it comes into play at the pre-contract stage of the relationship between owner and architect or whether the Court should look only to the post-contract stage because Mardirosian was disciplined for competing only at that stage. The Court is convinced that, ultimately, it must look to both aspects of the Standard.

First, the restraint of trade which Mardirosian contends is forbidden by section 1 of the Sherman Act is the promulgation and enforcement of an ethical standard which defines the circumstances under which architects can and cannot compete with one another. Broadly speaking, that is the restraint of trade [29] which caused Mardirosian injury to his business or property, see note 12, supra, and that nexus may be all that is necessary to give plaintiff standing to challenge all "aspects" of the challenged ethical canon.

Second, it is not disputed that Mardirosian's suspension was imposed as a result of his alleged violation of both the notice requirement and the post-contract aspect of the standard. As is developed below, the Court has concluded that both "aspects" of the Standard, particularly as applied to an actual contract in Mardirosian's case, are significantly anticompetitive. Even if the AIA is correct that it is the injury caused by these aspects of the rule which gives Mardirosian "standing," it would be absurd to suggest that the Court should not look to the broader restraint of which they are a part in evaluating their overall "impact on competitive conditions," National Society of Professional Engineers v. United States, 435 U.S. at 690, 98 S.Ct. 1355. Under the rule of reason, a court is to consider "all of the circumstances of a case in deciding

whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Continental T. V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977) (emphasis added).

The fact that the Standard is effective at the point of initial selection and continues until final termination of any ensuing contract by the owner is relevant to the reasonableness of those aspects of the Standard which, viewed more narrowly, Mardirosian was actually found to have violated.[30] Most important, in evaluating the AIA's primary justification for Standard 9—that it promotes the integrity of contracts—the Court must consider that the Standard actually operates in a far broader sphere than that of existing contractual relations between owner and architect.

## IV.

### A. Anticompetitive Impact

On the undisputed facts of this case, the conclusion that Mardirosian was suspended from membership in the AIA for in some manner competing with another architect is inescapable. The plaintiff was professionally disciplined for attempting to obtain a commission "belonging" to another architect, for obtaining that commission, and for not giving the other architect notice that he was going to do either. Such restrictions, placed on commercial conduct of member architects, are facially anticompetitive. They constitute a direct and significant restraint on trade.

Although the AIA emphasizes that the first architect here had an "existing contract," the fact is that the existing contract was one terminable at the convenience of

---

**29.** Although Standard 9 can be analyzed by separating its applicability into two components—restriction of competitive conduct during negotiations prior to a contract and restriction of competitive conduct subsequent to contract formation—both components pertain to the same behavior by the competing architect: attempting to obtain, offering to undertake, or accepting an architectural commission prior to termination of the first architect's "agreement"

and without notice. The Standard thus imposes one broad restraint over a defined time period (from initial selection through contract termination). The other ethical standard involved in the Mardirosian case, by contrast, regulates an entirely distinct area of behavior: use of another architect's designs without attribution.

**30.** See id.

the other party. In the spring of 1975, at the time of Mardirosian's alleged violation of Standard 9, the United States had an undisputed contractual right to effect the termination of Auerbach's services either for cause, or without cause. Having chosen to terminate Auerbach under the "convenience" clause of his contract, the United States as owner was obligated to compensate Auerbach for his work under a contract formula, and there is no dispute that Auerbach was paid in full as per the contract terms.

Yet, had the restrictions of Standard 9 been successful, the United States, a contractual party in no way bound by the AIA's canons of professional ethics, would have been prevented from *even negotiating* with an AIA-member architect until that member "had evidence" that the Auerbach contract had been formally terminated. As the AIA rules of ethical conduct were actually applied in the Mardirosian case, an owner who negotiates an architectural contract with the broadest of termination rights will have its options severely limited by having to terminate the first architect before seeking an AIA-member replace-

ment, leaving a perhaps lengthy gap in architectural services on a project.

The AIA's own statement of material facts makes this restriction *on competition* clear: "An architect can *compete for* and accept a commission for the basic architectural services on a project, when those services are subject to the existing contractual rights of another architect, *if* he is informed that the owner *has terminated the conflicting contract* with the other architect." Pt. II, para. 28(c) (emphasis added). In other words unless the prior contract is terminated, and he is so informed, an architect cannot "compete for" the commission.[31]

In the Mardirosian case, the responsible government officials, for reasons not material to the instant motion,[32] *first* negotiated with Mardirosian, who was serving as their architectural consultant, next secured his acceptance of their offer to perform the remaining architectural work on the Visitor Center project, and only then, approximately two and one-half months later, *formally* terminated the Auerbach contract. Several weeks later the government's original consulting contract with Mardirosian was amended to provide for full architectural services on the Visitor Center.[33] The AIA

---

**31.** Although it is not entirely clear in what sense the AIA uses the term "conflicting contract" to explain the competitive restriction imposed by Standard 9, neither on the face of the Standard, nor as the Standard was applied in the Mardirosian case, was there any requirement that the competition cause a breach of the original contract. Auerbach's contract with the Visitor Center owners was terminable at will; there has never been a contention in the instant motion that Auerbach's contract gave him an *exclusive* right to perform basic services during its pendency. Certainly, there is no indication in the findings or decision of the AIA's National Judicial Board that the question whether Auerbach's contract was breached was of any relevance to its Standard 9 inquiry. Apparently, the AIA uses "conflicting contract" to denote commissions for identical work as distinct from situations where different architects are employed on the same project but the work to be performed by each is different. *See* AIA Statement of Material Facts, pt. I, para. 1(b) & pt. II, para. 28(b)(1).

**32.** According to plaintiff's statement of material facts: At the time that the Government requested plaintiff to assume design and construction responsibilities for project 1, the

responsible Government officials expressly directed him to refrain from contacting defendant Auerbach concerning the Government's decision, stating that they would notify him after sorting through various considerations, e. g., the fact that defendant Auerbach had at that point completed all of the work called for under his contract and the question of whether defendant Auerbach's contract should be formally terminated for cause or for the convenience of the Government.

Para. 12. The only portion of this statement specifically disputed by the AIA in its statement of material facts is the allegation that Auerbach had completed all the work under his contract. *See* AIA Statement of Material Facts, pt. II, para. 12.

The government's letter instructing the railroad owners to terminate Auerbach's Visitor Center services refers to construction bids on Auerbach's designs which were "far, far above the budget." *See* note 8, *supra.*

**33.** This sequence of events was one of the AIA National Judicial Board's findings of fact in the Mardirosian case. The Board also found that government representatives at the Park Service

has not contended that any of this constituted a breach of Auerbach's contract, although vigorously advancing promotion of the integrity of contracts as the primary justification for Standard 9.[34]

■ In effect, then, the operation of Standard 9 in the Mardirosian case was quite similar to its operation at the selection stage of an owner-architect relationship. In both cases—at the selection stage and where the terms of a contract allow termination without cause [35]—Standard 9 limits the freedom of an owner by preventing him from doing what he would be perfectly free to do under his own understanding or contract with the first architect: negotiate with, select, or employ somebody else.[36]

At the selection stage, of course, the anticompetitive effect of the Standard is more blatant. As plaintiff describes that effect, in the Court's view, with substantial accuracy, Standard 9 imposes a "broad and artificial monopoly" as against any other AIA-member architect, the moment that one architect, by virtue of his initial selection by the owner, gets "his foot in the door" of a project.

But even at the post-contract stage, and even where the contract is not terminable at will, Standard 9 imposes a total ban on competition which prevents "attempts" to obtain any commission covered by the contract, and therefore prevents an owner from negotiating with another AIA-member architect until formal termination of the first contract. At both stages, the restraint is lifted only when the second architect "has evidence" of the termination *and* gives the first "written notice" of his intent to compete.

Overall, the conclusion is inescapable that Standard 9, on its face [37] and as applied in the Mardirosian case, has the purpose and necessary effect of suppressing competition. As the District of Columbia Circuit recently observed in *Smith*, a practice which, on its face, directly restrains competition may have other purposes and effects (*e. g.*, preventing professional deception) which "prevent the [restraint's] purpose from being described, in subjective terms, as nefarious." *Smith v. Pro Football, Inc.*, 193 U.S. App.D.C. at 31, 593 F.2d at 1185. "But," the Court concluded, "this fact does not prevent its purpose from being described, in objective terms, as anticompetitive, for suppressing competition is the *telos*, the very essence of the restraint." *Id.* 193 U.S.App. D.C. at 32, 593 F.2d at 1186. *See also National Society of Professional Engineers v. United States*, 435 U.S. at 693–96, 98 S.Ct. 1355.

Here, too, the AIA no doubt intended that its Code of Ethics and, in particular, Standard 9 would serve to prevent what it regards as unfair and deceptive competition. In the Mardirosian case itself, the AIA's National Judicial Committee may well have decided that Mardirosian acted

"instructed" Mardirosian not to notify Auerbach prior to entering into negotiations with him. Plaintiff's Motion for a Preliminary Injunction, exhibit A–21, at 8–9.

**34.** *See* notes 31, *supra,* and 45, *infra.*

**35.** The anticompetitive effect would be at least as great where, perhaps due to a material breach of contract by the first architect or the presence of a "for cause" termination provision in that contract, the owner becomes entitled to terminate the first architect by virtue of that architect's conduct.

**36.** Of course, the AIA's Code of Ethics does not directly bind non-members. But just because only half of the registered architects in the United States, and presumably the "cream of the crop," are unavailable to an owner unless the AIA's requirements are met, does not make the Standard any less anticompetitive. Nor is that fact of any comfort to the member architects who might wish to compete with their AIA colleagues in ways not permitted by Standard 9, but who must agree to the AIA Code of Ethics as a condition of membership.

Moreover the Code of Ethics also 'prevents members from associating in practice with or being employed by anyone who acts contrary to the code. *See* pt. I–B, *supra.*

**37.** In this case, as in *Professional Engineers,* the restraint of trade is apparent *on the face* of an ethical standard, and consequently "no elaborate industry analysis is required to demonstrate the anticompetitive character" of the agreement. 435 U.S. at 692–93, 98 S.Ct. at 1365.

unethically, unfairly, or deceptively. But the means the AIA has chosen to address these legitimate concerns is the imposition of a broad and direct restriction of competition after one architect has been "selected or employed," in any and all circumstances where the competition is directed at the same work covered by that selection or employment. Suppression of competition is ' the essence of this restraint as well; it is, therefore, necessarily anticompetitive.

### B. Procompetitive Justifications

Given the anticompetitive nature of Standard 9, the question, under the rule of reason, is whether the Standard is "unreasonably restrictive of competitive conditions." *National Society of Professional Engineers v. United States*, 435 U.S. at 690, 98 S.Ct. 1355 (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 65, 31 S.Ct. 502, 55 L.Ed. 619 (1910)). As noted above, the lesson of *Professional Engineers* for this inquiry is that the Court is "confined to a consideration of impact on competitive conditions." *Id.* 435 U.S. at 690, 98 S.Ct. at 1364. If a restraint is found to be significantly anticompetitive, it must have "legitimate business purposes whose realization served to promote competition," and "the 'anticompetitive evils' of the challenged practice must be carefully balanced against its 'procompetitive virtues' to ascertain whether the former outweigh the latter." *Smith v. Pro Football, Inc.*, 193 U.S.App.D.C. at 29, 593 F.2d at 1183.[38]

Even with regard to the activities of professional societies, long thought to be deserving of special treatment under the antitrust laws, it is now clear that an anticompetitive practice cannot be justified merely because, broadly speaking, it is rea-sonable. *National Society of Professional Engineers v. United States*, 435 U.S. at 688, 98 S.Ct. 1355. It is simply not relevant to the section 1 inquiry that an otherwise anticompetitive practice serves positive social values other than the promotion of competition. *See id.* at 688–96, 98 S.Ct. 1355.

The AIA advances two basic justifications for its broad restriction of attempts to obtain, or undertaking of, a commission until the first "selected or employed" architect is terminated: first, the restriction is said to promote, maintain, or ensure "the integrity of an architect's contract;"[39] second, the restriction is alleged to prevent professional deception and conflicts of interest, thereby permitting clients to make informed decisions free from undue influence and protecting clients from "unethical practices of architects who libel or slander fellow professionals in order to get work."[40] In addition, the notice provision is said to help maintain clear lines of architectural responsibility on a project, permit an orderly transfer of functions to a new architect, and ensure that the first architect does not perform needless work.[41]

The second justification stands on the same footing as the ethical justification rejected as a defense by the Supreme Court in *Professional Engineers*. Although, as the Court there acknowledged, "the problem of professional deception is a proper subject of an ethical canon," 435 U.S. at 696, 98 S.Ct. at 1367, it concluded that that problem cannot justify anticompetitive behavior under the rule of reason: "we may assume that competition is not entirely conducive to ethical behavior, but that is not a reason, cognizable under the Sherman Act, for doing away with competition." *Id.*

---

**38.** In *Smith* the Court also stated:

> [a restraint] can survive scrutiny under the rule of reason only if it is demonstrated to have positive, economically *procompetitive* benefits that offset its anticompetitive effects, or, at the least, if it is demonstrated to accomplish legitimate business purposes and to have a net anticompetitive effect that is insubstantial.

193 U.S.App.D.C. at 34, 593 F.2d at 1188 (emphasis in original); *see* note 18, *supra*.

**39.** AIA Opposition to Plaintiff's Motion for Partial Summary Judgment, at 7–9; AIA Statement of Material Facts, pt. I, para. 1(f).

**40.** AIA Opposition to Plaintiff's Motion for Partial Summary Judgment, at 9; AIA Statement of Material Facts, pt. 1, para. 1(g).

**41.** AIA Opposition to Plaintiff's Motion for Partial Summary Judgment, at 9–10; AIA Statement of Material Facts, pt. 1, paras. 1(f) & 1(g).

The argument that Standard 9's competitive restraints are justified because they prevent unfair and unethical conduct is not relevant to section 1 inquiry under the rule of reason. Section 1 does not prohibit professional societies from seeking to prevent unethical conduct. But it does mandate that significantly anticompetitive restraints imposed by those societies cannot be justified by reference to social goals other than competition.[42]

If the significantly anticompetitive restraints imposed through the promulgation and enforcement of Standard 9 are outweighed by the procompetitive impact of the rule, therefore, it can only be because it promotes competition by maintaining the integrity of (preventing "interference" with) architects' contracts. In the Court's view, however, this explanation cannot justify those restraints.

First, although there can be little doubt that one of the effects of Standard 9 is to protect architects' contracts, the AIA's brief explanation of the pro-competitive character of the Standard in its opposition is not accompanied by citation to a single source in the record indicating that maintaining the *integrity* of contracts is in fact a major purpose of Standard 9.[43] *See* AIA Opposition to Plaintiff's Motion for Partial Summary Judgment, at 6–9. And of the three sources cited in the AIA's Statement of Material Facts as record support for its general statement of the Standard's purposes, only one has anything to do with the "maintaining contracts" justification. *See*

AIA Statement of Material Facts, pt. 1, para. 1(f). That is to correspondence between an AIA official and the AIA general counsel which simply notes, in discussing an ethical inquiry on Standard 9, that the Standard "relates" to the legal doctrine of advantageous relations. *See* AIA Opposition to Plaintiff's Motion for Partial Summary Judgment, exhibit 8 (letter of July 15, 1974).

Second, even assuming that Standard 9 actually has as one of its principal purposes the preservation or promotion of contracts, another basic difficulty with the AIA's position is that promoting contracts is not, as the AIA seems to assume, the same as promoting competition. Although the AIA emphasizes that the Standard promotes contracts by preventing undefined "*interference* with contracts," on the undisputed facts of this case it could be said with equal accuracy that Standard 9 prevents *competition* with an architect who has been selected or employed, thus leaving the AIA defending the proposition that the Standard promotes competition by preventing competition. Not a single fact is alleged in support of the assumption that the AIA's activities in preventing "interference" with an architect's "selection or employment" promotes competition in the market for architects' services. *See id.*, brief at 6–9.

Although, in hypothetical circumstances, the promotion of contracts might effect other results which, in turn, promoted competition,[44] the Court has serious doubts as to

---

**42.** For the same reason, the restraints imposed by Standard 9 cannot be justified by the alleged purposes of the notice provision—that it maintains clear lines of responsibility on a project and permits an orderly transfer of functions between architects. The Court need not reach the question of whether the notice provision, *standing by itself*, could be said to have either no anticompetitive effect or an anticompetitive effect too insignificant to require procompetitive justification. *See Smith v. Pro Football, Inc.*, 193 U.S.App.D.C. at 34, 593 F.2d at 1188.

**43.** Interrogatory number 16 of plaintiff's first set of interrogatories to the AIA asked the defendant to state the purposes of Standard 9. The AIA's answer, filed prior to the Supreme Court's decision in *Professional Engineers*, that

Standard 9 "assures the continuation of the high ethics of the architectural profession and thereby serves the public interest," makes no reference to promoting competition by promoting contracts.

**44.** For example, a professional society might show that peculiar characteristics of its industry, perhaps a long term trend toward concentration of professionals into a few large firms in major cities as a result of predatory practices by those firms, warranted concerted action to preserve the ability of individual practitioners and small firms to compete. Assuming that the joint action was not done in such a manner as to constitute a classic group boycott which was *per se* unlawful, even fairly significant restraints on trade might, on balance, be found

whether, *in and of itself*, the promotion of contracts could ever be deemed procompetitive as that concept is used in *Professional Engineers*. There is, of course, no question that contracts, and their enforceability, are an integral part of our commercial world. *See National Society of Professional Engineers v. United States*, 435 U.S. at 688, 98 S.Ct. 1355. But the restraint of trade here at issue is not a contract between two architects for the performance of services, but concerted efforts by the members of a pre-eminent professional society in promulgating and enforcing a code of commercial conduct. .

The Supreme Court long ago recognized that every contract restrains trade within the literal meaning of section 1 of the Sherman Act. *Id.* at 687–88, 98 S.Ct. 1355. As interpreted, of course, section 1 makes unlawful only those contracts which *unreasonably* restrain trade. *Id.* But to argue, as does the AIA, that promoting contracts is *necessarily* equivalent to promoting competition turns the Act on its head. There is clearly nothing wrong with seeking to promote contracts, any more than with seeking to prevent professional deception. The issue here, however, is only whether the AIA's promotion of contracts through Standard 9 promotes competition in the market for architectural services and, if so, whether that positive impact on competition outweighs the anticompetitive aspects of the Standard.

■ Third, and most important, the AIA must justify Standard 9, not a hypothetical rule which maintains the integrity of contracts in a different or less restrictive way than does the actual Standard. According to the AIA, the Standard maintains the integrity of contracts by preventing interference with contracts. But the in-

quiry under Standard 9 is whether an architect has "*attempt[ed] to obtain, offer[ed] to undertake* or *accept[ed]* a commission" for which another AIA member had been "*selected or employed*," not whether an architect has *interfered*, in some nefarious way, with a member's contract.

The AIA's defense that the Standard merely maintains the integrity of architects' contracts by preventing contract interference is significantly undercut by the fact the rule applies not only to binding contracts, but also at the initial "selection" stage of the owner-architect relationship. Even at the contract stage, as actually applied in the Mardirosian disciplinary case, Standard 9 was held to be fully applicable even where the existing contract of the first architect was terminable at the will of the owner, where that architect was fully compensated pursuant to the terms of his contract, and where there was no contractual right to exclusive performance of services on the project in question. The contract "interference" for which Mardirosian was charged and suspended was *not* the inducement of a breach of Auerbach's contract, nor that he tortiously injured Auerbach, nor even that he competed in some unfair or deceptive way, but was only that he attempted to obtain and did in fact undertake work which was covered by Auerbach's contract, and did not give notice of the attempt or undertaking.

■ Finally, the AIA has intimated that its ethical standard merely "reflects" [45] the common law tort of interference with contractual relations and suggested that it is reasonable for that reason alone. Yet both that tort and the related tort of interference with prospective (pre-contract) advantage recognize, as a defense, the privilege of "competition." W. Prosser, *Law of Torts*

lawful under the rule of reason. *See generally* L. Sullivan, *Antitrust* § 85 (1977).

**45.** It does not, however, claim that Standard 9 encompasses *only* tortious conduct. In the District of Columbia, at least, the tort of interference with contractual relations, also known as the tort of inducement of breach of contract requires: "(1) existence of a contract, (2) knowledge of the contract, (3) intentional pro-

curement of its breach by the defendant, and (4) damages resulting from the breach." *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 288 (D.C.App.1977). The AIA would be hard pressed to argue that any of these elements are required in order to find a violation of Standard 9. Certainly, none are required on the face of the Standard.

§ 129 at 946 & § 130 at 954 (4th ed. 1971); *accord*, Restatement (Second) of Torts § 768 (1979). With regard to the first tort, interference with an existing contract, the privilege is recognized where, as in the Mardirosian case, the contract interfered with is terminable at will. W. Prosser, *supra* at 946; *accord*, Restatement (Second) of Torts § 768 (1979).

> In such a case there is no contract right to have the relation continued, but only an expectancy, which is similar to the expectancy of a business man that a customer will continue to do business with him. With such an expectancy of future relations, and prospective advantage, there has been no doubt that a competitor has the privilege of interfering to acquire business for himself. Accordingly, *the considerable weight of authority holds that there is a privilege of competition which extends to inducing the termination of agreements terminable at will, whether they concern employment or other relations.*

W. Prosser, *supra* at 946 (emphasis added). And with regard to the second tort, interference with contemplated or prospective contractual relations, the competition privilege applies in all cases:

> The policy of the common law has always been in favor of free competition . . . So long as the plaintiff's contractual relations are merely contemplated or potential, it is considered to be in the interest of the public that any competitor should be free to divert them to himself by all fair and reasonable means. Any other rule would tend to the recognition of trade monopolies.

W. Prosser, *supra* at 954; *accord*, Restatement (Second) of Torts § 768 (1979) (plus additional requirements not here relevant). Therefore, even were Standard 9 otherwise narrowly drawn to encompass only tortious behavior, and even if that were its only purpose and effect, the common law recognition of a privilege to compete, both at the pre-contract stage and where an existing contract is terminable at will, indicates that the "interference" which the AIA is attempting to prevent is far broader than the business interference prevented by the common law.[46]

### V.

The Court must conclude, therefore, that the AIA has offered no justification for Standard 9 which need be balanced against the Standard's anticompetitive purposes and effects. Accordingly, both on its face and as applied in the Mardirosian case, the Standard constitutes an unreasonable and hence, under sections 1 and 3, an unlawful restraint of trade, in commerce, which caused plaintiff injury to his business or property.

An order granting plaintiff partial summary judgment on the question of liability on Count I of the amended complaint accompanies this Opinion.

---

**46.** The AIA would not necessarily be insulated from antitrust liability even if Standard 9 prohibited *only* tortious conduct. *See Fashion Originators' Guild v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). Moreover, there is no question that even "state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity." *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 592–93, 96 S.Ct. 3110, 3118, 3119, 49 L.Ed.2d 1141 (1976).